# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ROBERT SULLIVAN,

        Plaintiff,

vs.

EXPERIAN INFORMATION
SOLUTIONS, INC.; RUSHMORE
LOAN MANAGEMENT
SERVICES, LLC; SELENE
FINANCE, LP; and DOES 1 to 10,
inclusive,

        Defendant(s).

**Case No.:**

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

1. **THE FAIR CREDIT REPORT
   ACT, 15 U.S.C. § 1681 *et seq.*; and**
2. **MASSACHUSETTS GENERAL
   LAWS, M.G.L. CH.93 § 54.**
3. **THE FAIR DEBT COLLECTION
   PRACTICES ACT**

**(Unlawful Credit Reporting Practices)**

## **INTRODUCTION**

1. Plaintiff Robert Sullivan ("Plaintiff"), by and through his attorneys, brings this action to secure redress from unlawful credit reporting practices engaged in by Defendants, Experian Information Solutions, Inc., ("Experian"), Rushmore Loan Management Services, LLC. ("Rushmore"), and Selene Finance, LP ("Selene"), ("Defendants").  Plaintiff alleges violations of the Fair Credit Report Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") and Massachusetts General Laws, CH.93 §54 ("MGL") and the Fair Debt Collection Practices Act 15 U.S.C. § 1692 *et seq.* (FDCPA).

## VENUE AND JURISDICTION

2.  Jurisdiction of this Court arises pursuant to 15 U.S.C. § 1681(p), which states that such actions may be brought and heard before "any appropriate United States district court, without regard to the amount in controversy."   The Court has jurisdiction over the state law claims pursuant to 15 U.S.C. § 1367.

3.  Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff resides in this District, Defendants transact business in the District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

4.  Plaintiff is a natural person who resides in the Town of West Bridgewater, Plymouth County, Massachusetts 02379.  Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681(a) and 1692a(3).

5.  Defendant, Experian Information Solutions, Inc. (herein after "Experian"), is a credit reporting agency with its principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, who regularly transacts business within the state of Massachusetts. At all relevant times herein, Defendant Experian, was an entity which, for monetary fees, dues, regularly engaged in whole or in part in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing

consumer reports to third parties, and used some mean or facility of interstate commerce for the purpose of preparing or furnishing consumer reports, and is therefore a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

6.   Defendant, Rushmore Loan Management Services, LLC. (herein after "Rushmore"), is a loan servicer with its principal place of business located at 15480 Laguna Canyon Rd, Irvine, California 92618, who regularly transacts business within the state of Massachusetts. Rushmore is an entity which engaged in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Experian is a "person" as defined by FCRA 1681a(b) and a debt collector as defined by 1692a(6).

7.   Defendant, Selene Finance, LP (herein after "Selene"), is a loan servicer with its principal place of business located at 9990 Richmond Ave, Houston, TX 77042, who regularly transacts business within the state of Massachusetts. Selene is an entity which engaged in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA. Further, Experian is a "person" as defined by FCRA 1681a(b) and a debt collector as defined by 1692a(6).

8. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers.

9. Plaintiff is informed and believes and on that basis alleges that Defendants are responsible for the acts, occurrences and transactions as officers, directors or managing agents of Defendants, or as their agents, servants, employees, and that each of them are legally liable to Plaintiff, as set forth below.

## **FACTUAL ALLEGATIONS**

10. Plaintiff purchased a residential property located at 11 Mile Brook Road, West Bridgewater, MA 02379 in 1983.

11. In or around 2004, Plaintiff refinanced the home.

12. In 2007, like many Americans, Plaintiff began experiencing serious financial hardships which caused him to seek relief from his creditors through the United States Bankruptcy Code.

13. Plaintiff filed for Chapter 7 Bankruptcy in 2007 and received a discharge in United States Bankruptcy Court District of Massachusetts on August 13, 2007 (Case No. 07-11467).

14. Plaintiff did not sign a reaffirmation agreement for the mortgage/note on the home and therefore the debt was discharged in the bankruptcy.

15. On or about December 19, 2007, Plaintiff signed a Foreclosure Repayment Agreement (hereinafter "FRA") in order to keep his home from being lost in foreclosure. Plaintiff made an initial $5,000.00 payment to GMAC Mortgage/Loss Mitigation after he received his bankruptcy discharge on the mortgage encumbering the property.

16. Between January 2008 and July 2008, Plaintiff made payments of $1,026.38 each month to GMAC Mortgage/Loss Mitigation as agreed to per the initial written Repayment Agreement.

17. In or around August 2008, Plaintiff received notice of transfer of the discharged mortgage payments and was informed that the discharged mortgage would be serviced by Select Portfolio Servicing, Inc. (hereinafter "SPS").

18. On August 18, 2008 SPS sent a letter to Plaintiff indicating that payments of $1026.38 were due on August 28, 2008; Plaintiff made the payment on 8/21/2008 online via "EZ Pay" through his bank.

19. Between August 2008 and October 2008, Plaintiff made payments of $1,026.38 each month to Select Portfolio Servicing, Inc. as agreed to per the initial Forbearance Agreement.

20. On or about October 21, 2008, Select Portfolio Servicing, Inc. sent Plaintiff a letter indicating that his new interest rate would be 5.12800% stating that his monthly payment would remain at $1,026.38; in the same letter SPS explained

that Plaintiff could pay more to offset "Negative Amortization" that was occurring with the discharged debt/loan.

21. On or about October 22, 2008, Plaintiff made a payment of $1,725.33 (bank ck. no. 0216610) to SPS for his November 1, 2008 payment based on his desire to apply more towards the principal balance on the home.

22. Between December 2008 and March 2009, Plaintiff made payments of $1,200.00 each month to SPS.

23. On or about December 6, 2008, Plaintiff sent a letter to SPS informing SPS that he would not be able to make payments of $1,725.00 but that he would continue to pay $1,200.00 towards the note despite the Forbearance Agreement only requiring a payment of $1,026.38.

24. On or about November 18, 2008, SPS sent a letter to Plaintiff informing him that the new interest rate on his discharged note was now 4.905% and further advised that his $1026.38 payment was projected to remain in effect until August of 2009; Plaintiff continued to pay $1,200.00.

25. On or about January 21, 2009, SPS sent a letter to Plaintiff informing him that the new interest rate on his discharged note was now 4.472% and further advised that his $1026.38 payment was projected to remain in effect until August of 2009; Plaintiff continued to pay $1,200.00.

26. On or about April 9, 2009, SPS sent Plaintiff a letter returning his April payment (ck. no. 1088), claiming that the payment was less than the amount required to cure the default on his loan; SPS further demanded payment of $47,589.77.

27. On or about May 14, 2009, Plaintiff made a payment of $2,372.22 to SPS for the months of April and May due to the returned check.

28. Between June 2009 and December 2009, Plaintiff made payments of $1,235.00 each month to SPS.

29. On or about August 12, 2009 SPS sent a demand for payment of $50,269.64.

30. On August 18, 2009 SPS sent Plaintiff a notice that the interest rate on his discharged loan was reduced, effective October 1, 2009, to 3.551% and that the monthly payment with taxes and insurance "will remain at $1,186.11…" and was projected to remain the same until August of 2010.

31. Plaintiff continued to make payments of $1,235.00.

32. In or around July 2009, Plaintiff requested a permanent modification so that he could remain in the home and have certainty of what his payment would be until the property was paid off.

33. On September 17, 2009, SPS sent Plaintiff a notice that the interest rate on his discharged loan was reduced, effective November 1, 2009, to 3.409% and that the monthly payment with taxes and insurance "will remain at $1,186.11…" and was projected to remain the same until August of 2010.

34. On December 18, 2009, Plaintiff paid his January 1, 2010 payment to SPS.

35. On or about January 6, 2010, Plaintiff finally obtained documents for a permanent loan modification that increased the payment to $1238.75.

36. On or about January 20, 2010, Plaintiff received a fully executed loan modification agreement from SPS. The agreement indicated that the new principal balance would be $352,535.28. The agreement stated that Plaintiff's principal and interest payments for years 1-5 would be $814.60 + an adjustable escrow payment of $424.15 for a monthly payment of $1238.75; Plaintiff immediately made a payment of $1238.75.

37. On May 1, 2010, Plaintiff made a payment of $1,246.65, an increase of $7.65; allegedly due to an increase in escrow (despite there being no evidence of an increase in property taxes or insurance costs).

38. Plaintiff made monthly payments of $1246.65 to SPS until the loan servicing was transferred.

39. On or about July 6, 2010, Plaintiff received notice, "Notice of Assignment, Sale or Transfer of Service Rights," that his mortgage will no longer be with SPS and would now be serviced by Acqura Loan Services (hereinafter "Acqura").

40. Between July 2010 and January 2011, Plaintiff made payments of $1246.40 each month to Acqura as agreed to per the modification agreement of January 6, 2010.

41. Plaintiff included additional information in the July 28, 2010 letter, informing Acqura that he received notice that his mortgage will no longer be with Select Portfolio Servicing, Inc.

42. Plaintiff included additional information in the August 27, 2010 letter, informing Acqura Loan Services that he has yet to receive any other correspondences or monthly statements from Acqura Loan Services after the initial "Notice of Assignment, Sale or Transfer of Service Rights" correspondence effective July 6, 2010.

43. Between January 2011 and May 2011, Plaintiff made payments of $1336.50 each month to Acqura Loan Services as agreed to per the modification agreement of January 6, 2010.

44. On or about June 16, 2011, Plaintiff received notice of a tax and insurance foreclosure statement, making his new payment $1274.59 effective August 1, 2011.

45. On or about June 21, 2011, Plaintiff made a payment of $1246.40 (ck. no. 1270) for his July payment and an additional $180.20 (ck. no. 1271) to Acqura Loan Services for his June 1, 2011 payment.

46. Between July 2011 and October 2011, Plaintiff made payments of $1274.59 each month to Acqura Loan Services as agreed to per the modification agreement of January 6, 2010.

47. On or about October 24, 2011, Plaintiff made a payment of $749.59 (ck. no. 1298) to Acqura Loan Services for his November 1, 2011 payment.

48. Plaintiff's check was reduced by $527.00 to cover a home insurance premium, paid directly to Bunker Hill Home Insurance Company due to Acqura's failure to pay the insurance premium and Bunker's threat to cancel insurance coverage.

49. Between November 2011 and January 2012, Plaintiff timely made payments of $1274.59 each month to Acqura Loan Services as agreed to per the modification agreement of January 6, 2010.

50. In or around December of 2011, Plaintiff received a refund of $189.00 following the belated receipt of the premium payment to Bunker Insurance, from Acqura Loan Services; Plaintiff immediately remitted payment to Acqura of the $579.00 he had withheld in November 2011.

51. Between January 2012 and July 2012, Plaintiff made payments of $1274.59 each month to Acqura Loan Services as agreed to per the modification agreement of January 6, 2010.

52. On or about June 8, 2012, Plaintiff received a letter, Tax and Insurance Account Disclosure Statement, dated June 8, 2012 that stated the new payment Plaintiff was to make was $1149.62 effective August 1,2012 through July 2013.

53. On or about July 16, 2012, Acqura Loan Services sent Plaintiff a letter notifying him that effective August 1, 2012 the account servicing of the loan was being transferred to Defendant, Rushmore.

54. The July 2012 letter indicated that Acqura loan services would accept payments with respect to the loan through the date of the transfer; 8-1-12.

55. On or around July 21, 2012, Plaintiff made his August 1, 2012 payment to Acqura with (ck. no. 1364) in the amount of $1,149.62.

56. On or about September 1, 2012, Plaintiff made a payment of $1274.59 (ck. no. 1381) to Rushmore for his September 1, 2012 payment; Plaintiff included a letter questioning why the payment amount was higher than the notice received by Plaintiff from Acqura and attached a copy of the June 8, 2012 notice showing that the payment should only be $1,149.62 as well as proof of the payment sent to Acqura.

57. Rushmore sent a statement, dated August 20, 2012 indicating that Plaintiff was owing for his July 1, 2012 payment and further indicated that Plaintiff was behind $2,549.18.  Rushmore also added late fees of $48.88 that Plaintiff did not owe.

58. On or around September 29, 2012, Plaintiff received a notice of "Annual Escrow Account Disclosure Statement and Change of Payment Notice" from Rushmore informing him that his new payment would be $1282.37 effective December 1, 2012.

59. Between October 2012 and December 2012, Plaintiff made payments of $1274.59 each month to Rushmore; Plaintiff also questioned why the payment was higher than the amount indicated by Acqura.

60. Each month, Rushmore would add late charges and/or property preservation fees to the statement; those late charges and/or fees varied month to month.

61. Between January 2013 and May 2013, Plaintiff made payments of $1282.37 each month to Rushmore.

62. On May 8, 2013, Plaintiff received a statement calling for a new payment amount of $1329.06. Plaintiff received no explanation as to why the payment had gone up approximately $47.00 each month.

63. Plaintiff paid this amount from June 2013 through April 2014; Plaintiff included a letter with every payment he sent; Rushmore continued to add late fees and property preservation charges to Plaintiff's loan.

64. On or about February 10, 2014, Plaintiff received a mortgage statement from Rushmore indicating that Plaintiff was 71 days late on his mortgage and owed $5,613.90 despite Plaintiff making monthly payments, in many instances in amounts greater than he was previously told he owed.

65. In or around May 2014 Plaintiff was approved for and received a hardship tax deferment from the Town of Bridgewater where he lived.  Plaintiff provided a

copy of the tax deferment approval and began deducting the tax amount from his

payment between June 2014 through September 2014.

66. On or about August 6, 2014, Plaintiff made a payment of $878.25 (ck. no. 244)

to Rushmore for his August 1, 2014 payment (less his tax deferment). Plaintiff

also resubmitted the July, 2014 payment (ck. no. 241) that was returned to him

by Rushmore.

67. On or about August 20, 2014, Rushmore sent Plaintiff a letter notifying him that

the account servicing would be transferred to Defendant, Selene.

68. On or about October 10, 2014, Plaintiff made two payments of $814.57 (ck. no.

248) and (ck. no. 249) to Selene for his September 1, 2014 and October 1, 2014

payments. Plaintiff provided evidence of the tax deferment.

69. On or about November 10, 2014, Plaintiff made a payment of $814.57 (ck. no.

254) to Selene for his November 1, 2014 payment.

70. On or about November 14, 2014, Selene sent Plaintiff a letter of his new updated

monthly payment that is $976.60 and confirmed that he had in fact received a tax

deferment.  Selene further acknowledge that Plaintiff had been making payments

but it was unable to verify whether the payments were honored by Plaintiff's

bank, a ridiculous claim; the payments had in fact been honored and paid.

71. Selene's letter confirmed funds were being held in a suspense account totaling

over $800.00.

72. On or about December 8, 2014, Plaintiff made a payment of $976.60 (ck. no. 259) to Selene for his December 1, 2014 payment.

73. On or about January 9, 2015, Plaintiff made a payment of $1108.38 (ck. no. 263) to Selene for his January 1, 2015 payment as requested by Selene.

74. On or about February 10, 2015, Plaintiff made a payment of $1108.38 (ck. no. 266) to Selene for his February 1, 2015 payment.

75. On or about February 28, 2015, Selene sent Plaintiff a letter with his February 2015 payment (ck. no. 266) back, claiming that the payment was less than the amount required to cure the default on his loan.

76. Selene refused to accept any further payments from Plaintiff.

77. On or about January 11, 2016, Selene sent Plaintiff a letter of "Notice of Default and Intent to Accelerate." Selene notified Plaintiff that the discharged mortgage loan associated with the Security Instrument is in default for failure to pay the amounts that were due on October 1, 2014 (despite Plaintiff having made payments from 2008 through the date Selene refused to accept payments). Selene demanded over $20,000.00 from Plaintiff to cure the default.

78. On or about May 10, 2016, Korde & Associates, PC sent Plaintiff a notice of intent to foreclose.

79. Plaintiff noticed that his credit reports reflected that the discharged debt had been reporting as late on his credit report, both Rushmore and Selene.

80. Further, Plaintiff noticed that the discharged debt was also reporting as a balance owing and past due as to Selene.

81. Plaintiff sent dispute letters to Experian by certified mail on May 12, 2016 bringing the matter to their attention in hopes that at a minimum his credit would not continue to suffer damage.

82. Experian replied on June 7, 2016, claiming to have fixed the issue; however, Defendant continues to inaccurately report derogatory payment history for accounts: Rushmore, account No. 102760000 and Selene, account No. 575000065.

83. Defendants continue to inaccurately report derogatory payment history for accounts: Rushmore, account No. 102760000 and Selene, account No. 575000065 including a balance due and an amount past due as to Defendant Selene.

84. The inaccurate reporting has caused Plaintiff significant emotional distress and mental anguish.

## COUNT I
## DEFENDANTS SELENE AND RUSHMORE VIOLATED THE FAIR CREDIT REPORTING ACT, (FCRA), 15 U.S.C. § 1681 *et. seq.*

85. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

86. The FCRA requires a furnisher, after receiving notice from a credit reporting agency that a consumer disputes information that is being reported by that furnisher, to conduct an investigation with respect to the disputed information, to review all relevant information, to report the results of the investigation to the credit reporting agency, and, if the investigation reveals that the information is incomplete or inaccurate, to report those results to all other credit reporting agencies to which the furnisher has provided the inaccurate information.

87. Within the last two years, Selence and Rushmore provided inaccurate information to the credit reporting agencies.

88. Within two years, Plaintiff notified Experian that it's report concerning Rushmore and Selene were inaccurate.  Thereafter, Experian notified Rushmore and Selene that Plaintiff was disputing the information they were reporting.

89. Rushmore and Selene violated §§ 1681n, o of the FCRA by engaging in the following conduct that violates § 1681s-2(b):

    a.  Willfully and negligently failing to conduct an investigation of the inaccurate information that Plaintiff disputed;

    b.  Willfully and negligently failing to review all relevant information concerning Plaintiff's mortgage;

    c.  Willfully and negligently failing to report the results of the investigation to the relevant Consumer Reporting Agency;

d.   Willfully and negligently failing to report the inaccurate status of the inaccurate information to all credit reporting agencies;

e.   Willfully and negligently failing to properly participate, investigate and comply with the reinvestigations that were conducted by any and all credit reporting agencies concerning the inaccurate information disputed by Plaintiff;

f.   Willfully and negligently continuing to furnish and disseminate inaccurate and derogatory credit, account and other information concerning Plaintiff;

g.   Willfully and negligently continuing to furnish and disseminate inaccurate and derogatory credit, account and other information concerning Plaintiff's account to the credit reporting agencies; and

h.   Willfully and negligently failing to comply with the requirements imposed on furnishers of information pursuant to § 1681s-2(b).

90. Selene and Rushmore's conduct were a direct and proximate cause, as well as a substantial factor, in causing serious injuries to Plaintiff that are outlined more fully above and as a result, both Selene and Rushmore are liable to compensate Plaintiff for the full amount of statutory, actual and punitive damages, along with attorneys' fees and costs, as well as other such relief, permitted by § 1681n.

//

//

//

//

## COUNT II

**DEFENDANT EXPERIAN VIOLATED THE FAIR CREDIT REPORTING ACT, (FCRA), 15 U.S.C. § 1681 *et seq.***

91. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

92. The Fair Credit Reporting Act provides that if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer, and the consumer notifies the agency directly of such dispute, the agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate, or delete the item from the file within 30 days of receiving the consumer's dispute notice. 15 USC § 1681i(a)(l)(A).

93. The Act further requires the credit reporting agency, within 5 business days of receiving notice of the consumer's dispute, to provide notification of the dispute to the person who furnished the information in dispute. The Act also requires the credit reporting agency to, "include all relevant information regarding the dispute that the agency received from the consumer." 15 USC § 1681i(a)(2)(A). In conducting its reinvestigation of disputed information in a consumer report, the

credit reporting agency is required to "review and consider all relevant information submitted by the consumer."

94. Within the two years preceding the filing of this complaint, Plaintiff notified Defendant Experian of an inaccuracy contained in its reports and asked them to correct the inaccuracy.

95. Defendant Experian failed to conduct a reasonable reinvestigation of the inaccuracies that Plaintiff disputed.

96. Defendant Experian failed to review and consider all relevant information submitted by Plaintiff.

97. The defendant credit reporting agency failed to employ and follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit reports, information, and file; violating 15 U.S.C. § 1681e(b).

98. As a result of the above-described violations of 15 U.S.C. § §1681i and 1681e(b), Plaintiff has sustained damages.

99. Defendant Experian's violations of the FCRA were willful; therefore, Plaintiff is entitled to seek statutory and punitive damages.

## <u>COUNT III</u>
## DEFENDANT EXPERIAN VIOLATED THE MASSACHUSETTS GENERAL LAWS, M.G.L. CH.93 §54

100.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

101.     Massachusetts General Law, Chapter 93 §54(b) reads: "Whenever a consumer reporting agency prepares or disseminates a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

102.     Plaintiff has repeatedly notified the defendant credit reporting agencies of an inaccuracy contained in their reports and asked them to correct the inaccuracy.

103.     Despite several notices, the defendant credit reporting agencies failed to review and remove or correct the inaccurate information.

104.     As such, the defendant credit reporting agencies failed to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit profile in violation of M.G.L. CH.93 §54(b).

105.     Moreover, the mere transmission of a verification form from defendant credit reporting agencies to a data furnisher falls far short of the required reasonable and fair process that would actually result in errors on consumers' credit reports being remedied or removed. This is particularly true when the agencies rely solely on the reply from the data furnisher as the full extent of their investigation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### COUNT IV
### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### DEFENDANTS RUSHMORE & SELENE

106.     Plaintiff incorporates herein by reference all of the above paragraphs of

this complaint as though fully set forth herein.

107.     Defendants violated the FDCPA through the following conduct:

    a.  Collecting or attempting to collect a consumer debt without complying

       with the provisions of 15 §1692 b – j inclusive;

    b.  Defendants attempted to collect a debt that was no longer owed or amounts

       in excess of what was owed by Plaintiff;

    c.  Defendants unlawfully assessed late fees and property preservation

       charges and threatened to take legal action that it could not take.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that judgment be entered against

Defendants for the following:

    A.  Actual/Statutory damages and attorneys' pursuant to 15 U.S.C. §§ 1681n

       and §§ 1681o;

B.  Actual/Statutory damages and attorneys' fees pursuant to 15 U.S.C. §§ 1692k;

C.  Punitive damages;

D.  Any pre-judgment and post-judgment interest as may be allowed under the law; and

E.  Such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiff, Robert Sullivan, demands trial by jury in this action.

RESPECTFULLY SUBMITTED,
**PRICE LAW GROUP, APC**

Dated: August 23, 2016

By:*/s/ Nick Yousif*
Nick Yousif
*Attorneys for Plaintiff,*
*Robert Sullivan*