**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ROBERT SULLIVAN,

Plaintif,

v.

EXPERIAN INFORMATION SOLUTIONS, INC., *et al.*,

Defendants.

No. 1:16-cv-11719-MLW

**PLAINTIFF'S MEMORANDUM IN OPPOSITION OF DEFENDANT SELENE FINANCE LP'S MOTION FOR SUMMARY JUDGMENT**

Case filed: August 23, 2016
Hon. Mark L. Wolf

**ORAL ARGUMENT REQUESTED**

## I. INTRODUCTION

This case arises from violations of the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA"). Defendant Selene Finance LP's ("Selene") violations stem from continued attempts to collect on a discharged debt, continued reporting of his on-time payments as late to the credit reporting agencies, despite the fact the debt had been discharged in bankruptcy, reporting a balance and late payment history without reporting that the debt had been discharged through a Chapter 7 bankruptcy and continuing to report the tradeline on Mr. Sullivan's credit report long after the seven years allowed by law.

Plaintiff has lived in his home since 1983. He is now seventy years old and only wishes to continuing living in his home while making payments as agreed, as he had done under the loan modification agreement, until he can sell the home or until he dies. Ever

since he filed bankruptcy, keeping his home has been complicated by the transfer of the servicing rights from one loan servicer to the next with each of them adding late fees, or property preservations charges, along with other unwarranted fees, in an effort to squeeze as much money from Mr. Sullivan as they could for the length of time they serviced the loan. Plaintiff made on time monthly payments from December 19, 2007 until Defendant Selene rejected his last payment made on February 1, 2015.

## II. STATEMENT OF FACTS

1. Plaintiff, Robert Sullivan acquired his home located at 11 Mile Brook Road in 1983. Sullivan Decl. ¶ 3.

2. Mr. Sullivan refinanced the home in 2004 with Washington Mutual. *Id.* ¶ 5.

3. In or around March of 2006, Mr. Sullivan was laid off from his job at the nuclear power plant. *Id.* ¶ 6.

4. As a result of his job loss, Mr. Sullivan fell behind on his monthly mortgage obligations. *Id.* ¶ 7.

5. In June 2006, Mr. Sullivan filed a pro se application for Chapter 13 bankruptcy protection in order to try and save his home from foreclosure; Case No. 06-11927 in the US Bankruptcy Court District of Massachusetts. *Id.* ¶ 8.

6. By September of 2006, Mr. Sullivan was behind on his mortgage to the tune of $25,600.48 which included foreclosure fees, late fees, interest and other charges. *See* Washington Mutual Letter to Mr. Sullivan dated September 21, 2006, attached hereto as **Exhibit A**.

7. Mr. Sullivan attempted to save his home through a loan modification with Washington Mutual. Sullivan Decl. ¶ 10.

8. In or around November of 2006, Mr. Sullivan was once again laid off from his job at the nuclear power plant. *Id.* ¶ 11.

9. On March 13, 2007, Mr. Sullivan filed for Chapter 7 bankruptcy protection. *Id.* ¶ 12.

10. Mr. Sullivan received a discharge of his debts in or around July of 2007; his discharge included his mortgage obligations. *Id.* ¶ 14.

11. Mr. Sullivan did not sign a reaffirmation agreement and therefore his personal obligations were discharged. *Id.* ¶ 13; *See also* Defendant's 30(b)(6) witness Edwards Dep. at 68:15-69:7, attached hereto as **Exhibit B.**

12. After the bankruptcy Mr. Sullivan entered into a foreclosure forbearance agreement wherein Mr. Sullivan made monthly payments to GMAC. Sullivan Decl. ¶ 15; *See also* Foreclosure Forbearance Agreement, attached hereto as **Exhibit C**.

13. Mr. Sullivan made every payment on time to GMAC. *Id.* ¶ 16.

14. In or around July 2008, Select Portfolio Servicing ("SPS") began servicing Plaintiff's mortgage. *Id*. ¶ 17.

15. Mr. Sullivan continued to make regular monthly payments following his bankruptcy each and every month following the foreclosure forbearance agreement. *Id.* ¶ 18.

16. In August of 2009, Mr. Sullivan entered into a 3-month trial modification with SPS. *Id.* ¶ 19.

17. Mr. Sullivan paid his monthly trial payments and the loan was set to be permanently modified in December of 2009. *Id.* ¶ 20.

18. SPS delayed sending Mr. Sullivan his permanent modification. *Id.* ¶ 21.

19. Mr. Sullivan made his anticipated January 2010 payment under the agreed terms of the permanent agreement. Plaintiff made every payment on time to SPS. *Id*. ¶ 22.

20. On or about January 6, 2010, Plaintiff received and signed a permanent loan modification agreement with SPS. *Id.* ¶ 23.

21. On or about January 20, 2010, Plaintiff received the fully executed permanent loan modification agreement. *Id*. ¶ 24.

22. Despite receiving Mr. Sullivan's January 2010 Payment, SPS demanded another payment alleged to be due January 1, 2010 even though the modification wasn't fully executed until January 20, 2010. *Id.* ¶ 25.

23. Mr. Sullivan disputed that he needed to make an additional payment in January; he continued to make on-time monthly payments each and every month. *Id.* ¶ 26.

24. This underhanded attempt to force Mr. Sullivan to make an second payment for January 1, 2010 is the basis for any and all allegations that Mr. Sullivan was ever late on his mortgage payments.

25. Servicing for Mr. Sullivan's loan transferred to Acqura Loan Services ("Acqura") on or about July 6, 2010. *Id.* ¶ 27.

26. In the welcome letter to Mr. Sullivan, Acqura does not allege a past due balance. *See* Welcome Letter from Acqura to Mr. Sullivan, attached hereto as **Exhibit D**.

27. Mr. Sullivan made every payment as agreed under the modification agreement to Acqura Loan Services. Sullivan Decl. ¶ 28.

28. Acqura began charging late fees and placing Mr. Sullivan's payments into a suspense account making it appear that Mr. Sullivan was delinquent on the loan modification. *Id.* ¶ 29.

29. On or about September 5, 2012, Mr. Sullivan's loan transferred to Rushmore Loan Management Services LLC ("Rushmore"). *Id.* ¶ 30.

30. Despite his loan having been discharged, Mr. Sullivan continued to make every payment on time to Rushmore in order to remain in the property. *Id.* ¶ 31.

31. On or about August 20, 2014, Mr. Sullivan's loan transferred to Selene Finance LP ("Selene). *Id.* ¶ 32.

32. Despite having no obligation to make mortgage payments, Mr. Sullivan made every payment on time to Selene in order to remain in the home until Selene refused to accept Mr. Sullivan's payments. *Id.* ¶ 33.

33. Despite Mr. Sullivan's payments, Selene sent letters and statements alleging Mr. Sullivan was delinquent on his payments, that he had a past due balance and that he needed to make a payment by the due date. *See* Sample Mortgage Statement from Selene to Mr. Sullivan, attached hereto as **Exhibit E**.

34. Selene further sent letters acknowledging that it was acting as a debt collector attempting to collect a debt. *See* Sample Letter from Selene to Mr. Sullivan dated May 27, 2015, attached hereto as **Exhibit F.**

35. On or about April 13, Mr. Sullivan obtained a copy of his credit report. Sullivan Decl. ¶ 34.

36. During a review of the credit report Mr. Sullivan learned that both Rushmore and Selene were inaccurately reporting his account as delinquent. *Id.* ¶ 35.

37. Mr. Sullivan noticed that Rushmore was reporting a tradeline on his credit report as late in the months of December 2013 through August 2014. *Id.* ¶ 36.

38. Mr. Sullivan noticed that Selene was reporting a tradeline on his credit report with a balance owing and late from December 2014 through January 2016; Selene further reported the discharged mortgage as being in foreclosure. *Id.* ¶ 37.

39. Neither Rushmore nor Selene accurately reported the account as having been discharged in bankruptcy.

40. On or about May 12, 2016, Mr. Sullivan disputed the inaccurate credit reporting by Rushmore and Selene to Experian. *Id.* ¶ 38.

41. Experian responded to Mr. Sullivan's dispute letter June 7, 2016 and provided a copy of his current credit report showing both the Rushmore and Selene tradelines with late payments, and as to Selene, it was still reporting a balance owing and several payments marked as late. *Id.* ¶ 39.

42. Derogatory accounts only remain on a credit report for 7 years. *See* Ex. B at 31:13-17.

43. Selene's Policy and Procedures regarding credit reporting of discharged debts is nearly identical to the Credit Data Industry Association's Metro2 Reporting Guidelines. *See* Excerpts from Selene's Policy and Procedures and the Metro2 Guidelines, attached hereto as **Exhibit G and H respectively**.

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir. 1993). However, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Prescott v. Higgins,* 538 F.3d 32, 39 (1st Cir. 2008) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990)).

## IV. SUMMARY JUDGMENT SHOULD NOT BE GRANTED IN FAVOR OF DEFENDANT

Not only should this Court deny Defendant's motion for summary judgment on Mr. Sullivan's FCRA and FDCPA claims, but due to the overwhelming evidence and arguments presented in the briefs, summary judgment should be granted in Mr. Sullivan's favor as to both claims. At a minimum, there are genuine issues of material fact that do not allow for a ruling in Defendant's favor.

### A. Defendant Improperly reported a tradeline on Mr. Sullivan's Credit Report and Failed to Conduct a Reasonable Investigation.

Under the FCRA, when a credit reporting agency notifies a "furnisher of information" of a credit dispute, it is required to investigate and report the results of its investigation back to the credit reporting agency. 15 U.S.C. § 1681s-2(b)(1)(A)-(C). If its investigation reveals that the information is incomplete or inaccurate, the furnisher must also report the results of its investigation "to all other consumer reporting agencies to which [it] furnished the information …." § 1681s-2(b)(1)(D). Furthermore, if the furnisher finds that the information is inaccurate or incomplete or cannot verify the information, then the furnisher **MUST** "modify that item of information, delete that item of information; or permanently block the reporting of that item of information." § 1681s-2(b)(1)(E) (emphasis added).

The First Circuit in *Chiang v. Verizon New Eng.*, Inc., 595 F.3d 26, recognized that a consumer has a private right of action, that the furnisher must perform a reasonable investigation, and that the test for such reasonable investigation is objective. *Id.* at 30.

### 1. Plaintiff's Debt was Discharged in Bankruptcy.

The Plaintiff's personal mortgage obligation was discharged in a Chapter 7 bankruptcy proceeding. Sullivan Decl. ¶ 14. All past personal liability was discharged, and the Plaintiff no longer owed any past debt concerning his mortgage. Thereafter, Plaintiff entered into a Foreclosure Repayment Agreement to avoid losing his home. *Id.* ¶ 13. Defendant acknowledges that it had an affirmative duty to report the account as included in Chapter 7 Bankruptcy.

> Q: Okay. So you're saying that -- correct me if I'm wrong, but I think I understand what you're saying is you guys just don't know how to report it because of the modification.
>
> A: At the time there seemed to have been confusion about how to report it. What we should have reported as being discharged …
>
> Q: And I wasn't even asking about anything necessarily in the document, other than to establish that the consumer guidelines, the standards created by the credit reporting agencies, are consistent with Selene's policy that, after a bankruptcy is discharged, you discontinue reporting any information about the account, any updating of that account information.
>
> That's your policy; right?
>
> A: Yeah, that's our policy.

Ex. B. at 94:19-95:1; 118:14-23. Despite this, Defendant Selene has reported to the credit bureaus that Plaintiff owes a balance of $328,435, is in the process of foreclosure, and

omits that the account was discharged in bankruptcy. *See* Excerpt of Plaintiff's June 7, 2016 Experian Credit Report, attached hereto as **Exhibit I**. The credit reporting agencies specifically include a section labeled "Responsibility" to illustrate who is liable for the debt. Defendant's unsupported contention that this section is only intended to differentiate between debts that belong to an individual debtor as opposed to debts that belong to multiple debtors is contradicted by the evidence and commonsense. Needless to say, the distinction is without a difference. What is important is that a credit report only reports **debts** that **belong** to the consumer.

> "A credit report is like a report card on how you manage your finances. It is a historical record of how and when you pay your bills, how much debt you have, and how long you have been managing credit accounts".[1]

The argument posited by Defendant that reporting a balance outstanding regarding a discharged debt, along with post-discharge late payment history on a consumer's credit report is not an inaccuracy is preposterous when you consider how the credit report is read by prospective creditors. Defendant relies almost entirely on Lance v. PNC Bank 2015 U.S. Dist. Lexis 122676. Unfortunately for Defendant, and what it fails to point out to the Court, is that *Lance* did not assert a claim under the Fair Credit Reporting Act because after Lance disputed the inaccuracies on his credit report, PNC made the appropriate corrections. The court in *Lance* was only tasked with deciding whether or not the conduct by PNC was a violation of the bankruptcy discharge injunction or whether PNC violated the

[1] https://www.experian.com/blogs/ask-experian/what-is-a-credit-report/

Massachusetts Credit Reporting Act or Chapter 93A. The court reasoned that *Lance* could not assert a claim under the Massachusetts Credit Reporting Act because it was preempted by the FCRA, not because it was reporting accurately. The Court never considered whether or not the conduct alleged by Lance was in fact a violation of the Fair Credit Reporting Act. Counsel's use of *Lance* is disingenuous and grossly misleading.

Despite the clear inapplicability of the *Lance* decision to the case at hand, Plaintiff will distinguish Lance as to its critical differences with the facts at hand. In *Lance*, the debtor filed for Chapter 7 bankruptcy on December 1, 2010 and received a discharge in his bankruptcy case. *Id.* at 2. Like Selene, PNC reported a past due balance and late payments after discharge and that it had started a foreclosure in May 2013. *Id.* Upon receiving a dispute from Lance, PNC immediately removed the late payment history, reported the account as current as of the date of the filing of the bankruptcy, and updated the credit report to reflect the account had been **discharged in bankruptcy**. *Id.* at 3 (emphasis added). Because PNC updated the credit report after receiving Lance's dispute, Lance did not assert a claim under 15 U.S.C. § 1681s2-b.

Plaintiff's facts are not only distinguishable from *Lance,* but Defendant admitted that it reported the account incorrectly both before and after Plaintiff disputed the account. Defendant failed to report the account as included in bankruptcy (as they were required to do) and further admitted that the account had aged off and should have been purged from Mr. Sullivan's credit report in or around March of 2014 at the latest.

Q: Okay. What are you -- well, when somebody files for a bankruptcy, are you supposed to report that the debt was discharged in bankruptcy?

A: Once the debt is discharged, we usually stop the credit reporting.

Q: Right. And you're also supposed to report that the account was discharged in bankruptcy; right?

A: Correct.

Q: All right. And one of the reasons why you would report that information is the data is supposed to be purged from someone's credit report after seven years; right?

A: Correct.

Q: Okay. Do you know when Mr. Sullivan filed for his bankruptcy?

A: No. The discharge was sometime in 2007.

Q: If I told you that he filed for bankruptcy March of 2007, then you would agree that – that any account reporting would cease seven years after that; right?

A: Correct

Q: In fact, it would be removed from his credit report altogether as of March 2014 – or thereabouts; right?

A: Yes. Normally on their course of -- like, a normal bankruptcy, that would happen; yes.

Ex. B at 31:4-32:6.

Worse yet, Defendant admits that it was aware that Mr. Sullivan had filed for and received a Chapter 7 discharge.

> Q: All right. So what I think I understood now is that when you started with Selene in 2015, your understanding was that there was a policy to look back seven years to identify whether a loan that you're receiving has been involved in some sort of bankruptcy.
>
> A: No. I'm sorry. I misspoke. When -- in 2015, we already had the policy -- when I started we already had the policy in place to look back further. And there's also the loan boarding process, where they verify the information after the boarding. So they would have pulled the credit report and seen that it was discharged in bankruptcy and find out about the bankruptcy at that point. I heard when I started that years before that there was some few-month period of months where they only check for seven years, and that was immediately corrected.

Ex. B at 66:13-67:7.

> Q: And if you got this loan, Selene got this loan in 2014 and began reporting it in 2014, it would have pulled a credit report at that time; correct?
>
> A: Correct.
>
> Q: So it would have had actual knowledge that Mr. Sullivan had filed bankruptcy; correct?

A: Yes.

Q: Would have had actual knowledge that Mr. Sullivan obtained discharge from that bankruptcy; correct?

A: Yes.

Q: When Selene learns of a loan that it acquired -- acquires for servicing that has been discharged in bankruptcy, what additional investigation does it do to identify whether or not that loan has been reaffirmed?

A: They do -- when they -- they use a system where they search the bankruptcy records, and they pull the records from the court to make sure if there's a reaffirmation of the debt.

Ex. B at 68:3-23.

By reporting Mr. Sullivan's account with a balancing owing, late payments and that a foreclosure had been started Selene was acting contrary to Consumer Data Industry guidelines. Selene cannot report that Plaintiff owes any amount due because it was discharged in bankruptcy and all credit reporting is expected to cease immediately after the debtor receives a discharge of that bankruptcy. *See* Ex. B at 118:14-23. The Metro2

guidelines[2] drafted by the Consumer Data Industry Association[3] require that furnishers of information, like Selene, cease reporting further information regarding accounts included in bankruptcy; no payment history other than that prior to the bankruptcy discharge should be reported. In fact, it reads in bold letters, "**Note: After reporting the discharge CII for all Filers, discontinue reporting the account.**" *See* Frequently Asked Questions Number 27 in the Consumer Data Industry Metro2 Guidelines, attached hereto as **Exhibit J**. Thus, reporting anything post-bankruptcy violates Defendant's own policy and the guidelines set forth by the credit reporting industry. As acknowledged by Defendant, the account should not have been reporting at all, and if it was reported, it had to report that the debt was discharged in bankruptcy.

As discussed above, Defendant relies almost exclusively on a tortured interpretation of *Lance*, in the hopes that this Court, and Plaintiff's Counsel, will gloss over the cherry-picked and out-of-context excerpts. As previously mentioned, *Lance* does not address any issues regarding post-bankruptcy reporting under the FCRA. In fact, *Lance* held that "PNC

---

[2] The Consumer Data Industry Association created the Metro2 reporting guidelines for a streamlined and universal way of reporting consumer data on credit reports. Credit Reporting Agencies, such as Experian, follow these guidelines and require furnishers of information, such as Selene Finance LP, to report according to the guidelines. http://www.cdiaonline.org/Metro2/content.cfm?ItemNumber=853

[3] https://www.cdiaonline.org/about/about-cdia/ With consumer spending accounting for approximately 70% of the U.S. gross domestic product, CDIA members provide organizations with information and analytical products that are key to the success of our nation's economy. Credit bureaus and specialty agencies offer fraud prevention and risk management tools that assist companies in assessing risk while ensuring fair and safe transactions for consumers. Resident and employment background check companies play a critical role in making our communities safer as well. CDIA members adhere to the Fair Credit Reporting Act which regulates how consumer reporting agencies use individuals' information and protects consumer rights. The result is a detailed regulatory credit system that limits the sharing of information for permissible purposes only and has strict requirements on accuracy, consumer access and correction.

was under no obligation under the **Bankruptcy Code** to change the way it reported the status of the loan." No. 15-10250-FDS, *3 (D.Mass. Sept. 15, 2015) (emphasis added) (quoting *In re Vogt*, 257 B.R. 65, 71 (Bankr. D. Colo. 2000)) (internal quotation marks omitted). It is a wonder that Defendant intentionally left out of its brief such critical information regarding the court's holding. To quote the case without pointing out the glaring differences is questionable to say the least.

As noted in *Johnson v. Home State Bank*, "a bankruptcy discharge extinguishes only one mode of enforcing a claim – namely, an action against the debtor *in personam* –while leaving intact another – namely, an action against the debtor *in rem*." 501 U.S. 78, 84 (1991). Thus, a servicer with rights to foreclose, such as Defendant, cannot report anything regarding the mortgage because personal liability has been eliminated.

**B. Defendant Selene Violated the FDCPA by Collecting on a Debt that was no Longer Owed.**

"A viable claim for violation of the FDCPA requires that a plaintiff establish three elements: '(1) that she was the object of collection activity arising from consumer debt, (2) defendants are debt collectors as defined by the FDCPA, and (3) defendants engaged in an act or omission prohibited by the FDCPA.'" *O'Connor v. Nantucket Bank*, 992 F.Supp.2d 24, 30 (D.Mass. 2014) (quoting *Som v. Daniels Law Offices, P.C.*, 573 F.Supp.2d 349, 356 (D.Mass.2008)).

Curiously, Defendant takes different positions depending on which claim it is challenging. First, when challenging Mr. Sullivan's FCRA claim, Defendant argues that it may report the loan balance and missed payments on Mr. Sullivan's credit report based

upon his "relationship" with the loan. In what appears to be an about face, Defendant argues that Mr. Sullivan may not bring an FDCPA claim because he does not owe the debt. It is difficult to reconcile these positions when one considers that, when a consumer challenges the validity of a debt, the creditor must now investigate the information it is reporting to the credit reporting agencies. *See* 15 U.S.C. § 1692e(8). The legislators recognized what Defendant refuses to admit to this Court: The reporting of a debt on a consumer's credit report is an affirmative statement to the world that the consumer owes a debt!

A "debt" as defined by 15 U.S.C. § 1692a(6) is [a]ny obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." The alleged debt that is at issue in this case is clearly a debt because a mortgage is a transaction primarily for household purposes, or even for personal or family purposes. In fact, there is practically nothing that could be more intrinsically tied to household, family, and personal purposes than the roof over one's head. Thus, the mortgage that Defendant is collecting on is a debt under the FDCPA. The fact that Mr. Sullivan does not owe the debt does not matter.

Defendant argues that its conduct is not actionable under the FDCPA because somehow Plaintiff is not a "consumer." A "consumer" is "any natural person obligated or **allegedly obligated to pay any debt**." 15 U.S.C. § 1692a(3) (emphasis added). Plaintiff is

no doubt a consumer under the FDCPA because Defendant sent him collection statements alleging that he owed a debt. Defendant consistently sent statements to Plaintiff which stated that Plaintiff owed a specific amount each month, that he was delinquent or past due. *See e.g.*, Exhibit E. Therefore, Plaintiff is a consumer because he is a natural person allegedly obligated to pay a debt.

There is no doubt that Defendant Selene is a debt collector for purposes of the FDCPA. Under the FDCPA, a "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. 1692a(6). In order to define Selene as a debt collector, Plaintiff must establish that Selene, as a loan servicer, acquired the servicing rights after the debt went into default. *See In re JPMorgan Chase Mortgage Modification Litig*., 880 F. Supp. 2d 220, 243 (D. Mass. 2012).

Here, Defendant is a debt collector because it uses the mails as a principal purpose to collect debts. It also regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Defendant sent multiple letters to Plaintiff which state clearly that Defendant is a **debt collector attempting to collect a debt**. *See e.g.*, Ex. F. Under the least sophisticated debtor standard, a person who receives a letter from their loan servicing company which states the company is a debt collector is going to believe the loan servicer is a debt collector. Therefore, there is no question that Defendant Selene is a debt collector.

In *Stagikas v. Saxon Mortgage Services, Inc.*, the Court stated the following in regard to the statements that Stagikas received:

> "…. the balance statements he received that included late charges and the phrase 'TOTAL AMOUNT DUE' along with the statement 'Saxon Mortgage Services is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose' **could certainly be considered a collection attempt, or at least connected to one**. (Stagikas Aff. Ex. 6, 8). Plaintiff shows there is a question of fact on his claim of an FDCPA violation regarding 15 U.S.C. § 1692c."

No. 10–40164–TSH, 2013 WL 5373275 (D.Mass. Sept. 24, 2013) (emphasis added). Just like in *Stagikas*, Plaintiff received statements and letters that had similar debt collector language, and therefore Defendant is a debt collector for purposes of the FDCPA. Because Defendant Selene is a debt collector that collected on an alleged debt that is no longer owed from Plaintiff, who is a consumer, it violated the FDCPA. Therefore, this Court should deny Defendant Selene's motion for summary judgment on Plaintiff's FDCPA claim.

## V. CONCLUSION

In summation, Defendant tries to paint a picture that is almost exactly opposite of the truth here. Selene tries to say that it was not a debt collector, and it was allowed to report to the credit agencies and attempt to collect on a non-debt that Plaintiff owed. The truth of the matter is that Defendant was acting as a debt collector and was unlawfully reporting to the credit agencies and trying to collect on a non-debt for which Plaintiff was not personally liable, and which, even if he had been personally liable for the balance owed on the home post-bankruptcy, should not have been reported after seven years. Practically the only thing that Selene gets right in its motion is that the alleged debt that they were

trying to collect was not a real debt; it was merely an alleged debt under the FDCPA's least sophisticated consumer standard. For the aforementioned reasons, this Court should deny Defendant Selene's motion for summary judgment on Plaintiff's FCRA and FDCPA claims. Plaintiff has shown that the evidence establishes that Plaintiff, not Defendant, is entitled to the relief sought by Defendant, and therefore, at a minimum, this motion should be denied in its entirety.

Respectfully submitted this 14th day of March 2018.

**PRICE LAW GROUP, APC**

/s/ *David A. Chami*
David A. Chami, AZ #027585